IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **THE CHARTER OAK FIRE** | * |
| **INSURANCE COMPANY** | * |
| | * |
| **v.** | * |
| | *   **Civil No.  JKS 09-1894** |
| **MARLOW LIQUORS, LLC, et al.** | * |
| | * |

**MEMORANDUM OPINION**

William Cunningham d/b/a B.C. Electric (Cunningham), as a third-party defendant/cross-plaintiff/cross-defendant, moves for summary judgment, or in the alternative, for sanctions. (ECF No. 171). The underlying dispute in this diversity action involves a fire that occurred at a property operated by Marlow Liquors, LLC (Marlow), located in a shopping center owned by Marlow Heights Shopping Center, L.P. (MHSC). The shopping center is managed by Gelman Management Company (Gelman). MHSC and Gelman are both insured by National Surety Co. (NSC). Marlow is serviced electrically by Potomac Electric Power Company (Pepco). Cunningham claims that Marlow, MHSC, Gelman, NSC and Pepco are all responsible for discarding relevant evidence that was critical to his defense. Each of these parties opposed Cunningham's motion for summary judgment.[1] (ECF Nos. 179, 180, 181 and 176). No hearing is necessary. *See* Local Rule 105.6. For the reasons set forth below, Cunningham's motion is denied in part and deferred in part.

**I.   Background.**

The fire occurred on June 17, 2008, at the Marlow Heights Shopping Center in Prince George's County, Maryland, on the premises of Marlow Liquors, located at 4141 Branch

---

[1] MHSC and Gelman filed a joint response to Cunningham's motion for summary judgment. NSC filed a separate response. For purposes of this dispute, the interests of NSC, MHSC and Gelman are the same. From this point forward, references to Gelman as a party also include MHSC and NSC.

Avenue, one of the units in MHSC.  The fire caused substantial damage to Marlow Liquors' property, (ECF No. 32, ¶ 32), and the adjacent business, Marlow Wing House, located at 4147 Branch Avenue.  (ECF No. 1, ¶ 8; ECF No. 32, ¶ 1).

This lawsuit was initiated by the Charter Oak Fire Insurance Company (Charter Oak), the insurer of Marlow Wing House.  Charter Oak filed a complaint against Marlow Liquors and Pepco.  Subsequently, Marlow Liquors filed a third party complaint and cross-claim against Cunningham, alleging that the fire was caused by undersized meter conductors installed by Cunningham.  Pepco filed a cross-claim against Cunningham arguing the same.  Pepco then filed a second amended third-party complaint naming Marlow, Gelman and MHSC as third-party defendants.  Pepco alleged that Gelman and MHSC hired Cunningham, an unlicensed and unqualified electrician, to perform electrical work at the shopping center and that Cunningham, under the supervision of Gelman and MHSC, installed a faulty electrical system.  Cunningham filed cross-claims against Pepco and Marlow.  Finally, Gelman and Cunningham filed claims against one another.

Cunningham's pending motion contends that the court should dismiss all claims against him "because the parties bringing those claims spoliated evidence likely to lead to the discovery of admissible evidence by failing to preserve the electrical circuit breaker boxes, and metal halide lamps."  (ECF No. 171, Cunningham Summ. J. Mot. at 2 ¶ 5).

**II.    Discussion.**

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citations omitted).  To prove spoliation that warrants a sanction, a party must show that:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520-21 (D. Md. 2010) (citations omitted).

Upon a showing that spoliation has occurred, a court can impose sanctions molded "'to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" *Silvestri*, 271 F.3d at 590 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). The court has significant discretion to consider a wide range of sanctions "'both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.'" *Id.* (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

Cunningham asks this court to dismiss all claims against him as a sanction for the alleged acts of spoliation. Dismissal is the severest sanction available in a spoliation case.

> [T]o justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

*Id.* at 593. In sum, to resolve Cunningham's request for dismissal on account of spoliation, the court must determine whether the alleged spoliators had a duty to preserve evidence, whether they had a culpable state of mind, whether they failed to preserve relevant evidence, and the degree of prejudice suffered by Cunningham.

**A. Duty to Preserve Evidence.**

"The duty to preserve evidence includes an obligation to identify, locate, and maintain, information that is relevant to specific, predictable, and identifiable litigation." *Victor Stanley*, 269 F.R.D. at 522 (citation and quotation marks omitted). "[P]arties must preserve potentially relevant evidence under their 'control,' and in the Fourth Circuit . . ., documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Id.* at 523 (citations and quotation marks omitted). "[T]he preservation duty applies not only when the evidence is in the party's control; there is also a duty to notify the opposing party of evidence in the hands of third parties." *Id.* (citations omitted).

Pepco, Gelman and Marlow all argue that they did not owe a duty to Cunningham to preserve the circuit breaker panels and metal halide lights. Each party's duty will be discussed in turn.

    (1) Gelman

Gelman does not dispute that it knew about Cunningham's electrical work in the store before the circuit breaker panels and halide light fixtures were removed. Indeed, Gelman, in connection with MHSC, hired Cunningham to perform this work. (ECF No. 171, Ex. P, Mosslih Dep. 45). Instead, Gelman contends that it had no duty to preserve the circuit breaker panels or the halide light fixtures because (1) they are not relevant to any claims or defenses and (2) Gelman is not the owner of these items. (ECF No. 180, Gelman Opp'n 10). Neither argument is persuasive.

First, Gelman's duty to notify Cunningham of a potential claim does not turn on whether the evidence is *relevant*. Relevance is a separate analysis taken up under part three of the

spoliation doctrine.  Rather, Gelman's duty turns on whether the evidence is *potentially relevant*. *Victor Stanley*, 269 F.R.D. at 523.  The circuit breaker panels and halide lights are potentially relevant because they were components of the electrical apparatus that may have caused the fire. A party does not have a license to destroy evidence based solely on its own subjective view of its potential relevance.

In addition, duty arises from control as well as ownership, and as the property manager, Gelman had the presumptive ability to control the items.  Finally, even if control was in question, Gelman had an obligation to give Cunningham notice of access to the evidence.  *Silvestri*, 271 F.3d at 591 ("If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.") (citation omitted).  Either way, Gelman owed a duty to Cunningham regarding this evidence.

        (2) Marlow Liquors

Marlow argues that it had no duty to preserve this evidence for Cunningham's benefit because "at the time of the inspections in June and July 2008, Marlow Liquors simply didn't know that Cunningham existed."  (ECF No. 179, Marlow Opp'n 16).  Vishal Tandon, the owner of Marlow Liquors, testified that before the fire "[Cunningham] walked in with Mr. Mohammed [the maintenance worker for the shopping center] a few times in the store," and he saw Cunningham "three, four times, five times . . . in the shopping center doing some work in electric poles or maybe [someone would] send him by."  (ECF No. 171, Ex. O, Tandon Dep. 114). Tandon retained Cunningham after the fire "[t]o build the electric system back up, [and] to put all the wiring [in] for my coolers and everything," *id.* at 115, and learned that Cunningham had

"buil[t] the electric part of the place." *Id.* at 116.  On June 18, 2009, Tandon had a discussion with Ronald Thomsen, a cause and origin investigator for Gelman; Jean Hargrove, the claims adjuster for NSC; and Ray Leverty, a representative for Gelman, about electrical work that had been performed at the store a few years prior to the fire.  (ECF No. 171, Ex. R, Thomsen Dep. 79).  Thomsen knew that the electrical work performed prior to the fire could be an issue in the case, *id.* at 79, and Marlow should have known of Cunningham's possible status as a party.   The court further notes that it was Marlow that brought Cunningham into this lawsuit.  (ECF No. 32, Marlow's Third Party Complaint against Cunningham).

Cunningham also relies on *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 706 (D. Md. 2009), to argue that "as an interested party with access to evidence, [Marlow] had a duty to 'track down and notify' any potentially interested party that it has 'the means' to identify."  (ECF No. 183, Cunningham Reply Mot. 4).  Cunningham contends that Marlow had a duty to search the public records to see who, if anyone, had worked on the store's electrical system, and contends that if Marlow had conducted this simple search, it would have discovered two permits indicating that Cunningham performed work at the store in December 2004.  (ECF No. 183, Ex. W).

In *Erie*, a fire occurred near a fireplace in a residential property, and Erie's experts concluded that the firebox installer omitted a crucial safety strip.  659 F. Supp. 2d at 702.  The Court found that Erie had a duty to identify the installer:

> [B]oth [experts] noted the firebox manufacturer's name and address.  This is significant because, armed with this information, Erie had the means to track down and notify the installer before the fire scene was destroyed.  Because of this, there is no excuse for Erie's long delay in notifying BSG.

*Id.* at 705.  The Court also noted that "[a]s a sophisticated insurer, Erie is well versed in the law of subrogation." *Id.* at 707.

6

In this case, Marlow suffered significant property damage. Once it was determined that the fire originated around the meter box and electrical equipment, the duty arose to contact any parties associated with that equipment to allow them the opportunity to inspect the scene. Indeed, this is exactly what Marlow did for Pepco, leaving the fire scene undisturbed until Pepco was given a chance to examine it. Marlow breached its duty to give Cunningham similar treatment.

### (3) Pepco

Pepco concedes that it failed to give Cunningham notice of access, but asserts, like Marlow, that it was unaware of Cunningham's involvement when it inspected the scene. (ECF No. 176, Pepco Opp'n 11). Cunningham argues that Pepco, as a sophisticated public utility, should have checked its own electrical usage data, which was relied on by various experts to allege an overload against Cunningham. Pepco contends that Cunningham and Gelman should have notified it of the added electrical load, but does not deny that it had the ability to monitor its own equipment. Indeed, the overloading of the electrical system is Pepco's defense and theory of liability against Cunningham. Pepco, like Marlow, had a duty to track down and notify Cunningham about the potential for future litigation before discarding potentially relevant evidence.

## B. Culpable State of Mind.

"The second consideration for resolving a spoliation motion is to determine whether the alleged spoliator acted culpably." *Victor Stanley*, 269 F.R.D. at 529. "[A]ny fault—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a sufficiently culpable mindset." *Id.* (citations omitted).

"Negligence, or culpable carelessness, is the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." *Id.* (citation and quotation marks omitted). "Gross negligence, which is something more than carelessness, differs from ordinary negligence only in degree, and not in kind." *Id.* (citation and quotation marks omitted). "Willfulness is equivalent to intentional, purposeful, or deliberate conduct." *Id.* at 530. "'Willfulness' does not require bad faith, but can instead be demonstrated by intentional or deliberate conduct resulting in spoliation." *Genuine Dubmax, Inc. v. Greektown LLC*, 2012 U.S. Dist. LEXIS 65632 at *9 (D. Md. May 10, 2012) (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008)). "[B]ad faith requires destruction for the purpose of depriving the adversary of the evidence . . . ." *Victor Stanley*, 269 F.R.D. at 530.

In *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995), the owner of a boat was killed by an explosion. His surviving spouse, Shirley Vodusek, sued the manufacturer and repair company, alleging negligence and products liability. *Id.* at 151. In examining the boat to discover the cause of the explosion, Vodusek's expert removed materials from the boat and "employed destructive methods which rendered many portions of the boat useless for examination by the defendants and their experts." *Id.* at 155. The trial court found that "Plaintiff's agents took affirmative actions which severely interfered with the Defendants' ability to conduct their own scientific investigation of the evidence and to develop a defense." *Vodusek v. Bayliner Marine*, 1994 A.M.C. 2343 at *2344 (D. Md. April 7, 1994). By removing materials from the boat, the trial court stated that plaintiff's expert "in effect, set the agenda for the investigation as to the cause of the fire"; indeed, "evidence that might have shown some other cause was lost forever." *Id.* at *2346. As a result, the trial court instructed the jury that it was permitted to "assume that evidence made unavailable to the defendants by acts of plaintiff's

counsel or agents . . . would have been unfavorable to the plaintiff's theory in the case." *Vodusek*, 71 F.3d at 155.

On appeal, Vodusek argued that the trial court gave an erroneous jury instruction because there was no evidence of the "necessary element" of bad faith. *Id.* The Fourth Circuit rejected this argument and affirmed the decision of the trial court. The Court reasoned:

> While Vodusek may be correct in concluding that she and her expert did not act in bad faith in destroying portions of the boat, she does not dispute that those portions were permanently destroyed as part of Halsey's deliberate investigative efforts. While Halsey may have decided that the destroyed portions of the boat were not relevant to his theory of the case, that conclusion ignored the possibility that others might have entertained different theories to which the destroyed portions might have been relevant. In this case, both the defendants and the district court concluded that the destroyed portions were significant to the effort to explain where and why the boat explosion occurred.

*Id.* at 156. Because the "intentional conduct contribute[d] to the loss or destruction of evidence," the Court concluded that the adverse inference jury instruction was appropriate. *Id.* at 156; *see also Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008) ("[T]he DEA's document destruction, though not conducted in bad faith, could yet be 'intentional,' 'willful,' or 'deliberate.'") (citing *Vodusek*, 71 F.3d at 156).

More recently, in *Greektown*, 2012 U.S. Dist. LEXIS 65632, a fire occurred at an industrial property. Plaintiffs alleged that smoke, ash and soot from the fire caused significant damage to its business and that the fire would not have occurred if defendant had maintained the property as required by law. *Id.* at *2. A few weeks after the fire, plaintiffs moved the damaged equipment to a secured storage unit, but soon they could no longer afford the storage space and discarded the equipment. *Id.* at *2-3. "From the time of the fire through the time the equipment was removed, Plaintiffs did not believe they would be able to afford litigation regarding their losses from the fire." *Id.* When plaintiffs ultimately retained counsel and initiated a lawsuit,

defendants contended that plaintiffs spoliated the allegedly damaged equipment. The Court agreed, finding that "Plaintiffs intentionally divested themselves of the damaged equipment prior to initiating litigation against Defendant" and therefore "Plaintiffs' actions . . . involving . . . spoliation of physical evidence warrant[ed] a . . . finding of willful conduct." *Id.* at *9-10.

Here, Marlow, Gelman and Pepco, like the plaintiffs in *Greektown*, intentionally divested themselves of potentially relevant equipment prior to initiating litigation against Cunningham. In doing so, they ignored the possibility that another party who might be implicated would also need to inspect the scene, might entertain a different theory, and might require different evidence to substantiate that alternative theory. As discussed below, Gelman and Marlow deliberately discarded the halide light fixtures and Gelman, Marlow and Pepco deliberately discarded the circuit breaker panels.

The first group inspection of the scene occurred on June 27, 2008. Present at the scene was Marlow's expert, Robert Neary, and Gelman's experts, Ron Thomsen and Bruce Crowly. These parties assumed control over the items at the investigation scene. Crowly testified that "someone [at the scene] mentioned about there being what's referred to as an HID, high intensity discharge light fixture up in the ceiling and someone thought that maybe there was an explosion of a lamp that would have caused the fire." (ECF No. 171, Exhibit J, Crowly Dep. 173). Crowly then photographed one of the light fixtures as part of his inspection of the scene. These facts notwithstanding, Marlow and Gelman chose to discard the halide lights. This conduct was willful.

Cunningham does not argue that Pepco acted willfully with regard to the halide lights, but contends that Pepco was grossly negligent because "there is no evidence that Pepco affirmatively attempted" to preserve them. This argument is not persuasive. First, as the

movant, the burden is on Cunningham to show that Pepco acted with a culpable state of mind, not on Pepco to show that it attempted to preserve the halide lights.  Second, there is no evidence that Pepco was present when the decision to discard them was made.  Because Cunningham cannot place Pepco at the scene when the other parties decided the fate of the halide lights, Pepco is not culpable for that loss.

The July 2, 2008 investigation focused on the significance of the metering equipment and, to a much lesser degree, the circuit breaker panels.  (ECF No. 171, Ex. R, Thomsen Dep. 47-48).  Mr. Thomsen summarized the thought process behind discarding the panels:

> There was a discussion amongst the engineers present.  I don't remember who all of them were.  I know Mr. Crowly was there, Mr. Neary was there, Mr. Wunderlund or Wunderling was there, and I don't know [about] anyone else.  But the discussion was do we need to take these two circuit breaker panels and their opinion was that the circuit breaker panels did not provide anything additional to the conclusions of where and how this fire started.

*Id.*  Mr. Rich Martin and Mr. D.L. Mattox, representatives of Pepco, were also present for this investigation.  (ECF No. 171, Ex. A, Neary Dep. at 156).  Mr. Neary testified that Martin and Mattox "agreed that we didn't need [the circuit breaker boxes]."  *Id.* at 158-59.  The fact that these representatives agreed that the circuit breaker panels were not relevant is not sufficient to discharge the duty to preserve *potentially* relevant evidence; what these representatives deemed relevant is not necessarily the same as what another interested party may deem relevant.  *Clark Constr. Group v. City of Memphis*, 229 F.R.D. 131, 136-37 (W.D. Tenn. 2005) ("[T]he decision as to what was potentially relevant should not have been left to Webber's sole discretion. Webber is not a lawyer, and counsel for the City admitted during the hearing that he was not necessarily qualified to ascertain whether a document or handwritten notation was potentially

11

relevant."); *see also* FED. R. CIV. P. 26(b)(1). Pepco, Marlow and Gelman had the ability to preserve the circuit breaker panels but instead willfully discarded them.

  **C. Relevance of Lost Evidence.**

  Having shown duty and culpability, Cunningham must also show that the circuit breaker panels and/or halide lights were relevant to his defense. "In the context of spoliation, lost or destroyed evidence is relevant if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Victor Stanley*, 269 F.R.D. at 531-32 (citation and quotation marks omitted).

  Cunningham's electrical engineer Michael Wald opines that the fire was most likely caused by an electrical failure in Pepco's metering equipment exacerbated by undersized wiring:

> [T]he most likely cause of this fire is an electrical failure in the metering equipment. The cause of this failure was a loose connection from [the] A-phase of the supply system to wiring for the meter at the test block. The inspection and maintenance of this connection is the responsibility of PEPCO. Moreover, PEPCO had notice of this developing problem when its meter became smoked, but took no actions to discover the cause of this situation. Had PEPCO acted responsibly in addressing this situation this fire could have been prevented. Thus the proximate cause of this fire is PEPCO's failure to properly maintain its metering equipment.

(ECF No. 179, Marlow Resp., Ex H. at 3-4). Wald also identifies a second possible source of the fire, the "ignition of combustible materials by an unidentified source," but "[g]iven the unreliability of witness statements and the lack of any other identified sources of ignition it seems more likely that this fire was the result of an electrical failure in the metering equipment." *Id.* at 3. Wald does not mention the circuit panels or the halide lights.

  Cunningham's cause-and-origin expert Michael Schaal points to two potential causes for the fire: (1) a metal halide lamp rupture; and (2) an electrical fault in the meter base and cabinet. (ECF No. 171, Cunningham Summ. J. Mot., Ex. L at 10). With regard to the first theory, Schaal

opines that when metal halide light bulbs fail, hot particles can fall on combustible materials, and that, in this case, "a rupturing of a metal halide light fixture cannot be eliminated as an ignition scenario" because "there was insufficient documentation with respect to the lighting system within the structure." *Id.* In addition, Inspector Crowly could not recall whether the metal halide light fixtures he observed had bulbs in them; he merely photographed one such fixture which he eliminated as a cause based on its location. (ECF No. 171, Ex. J at 173-76). Pepco's expert David Icove testified that the halide light fixtures should have been preserved even if they were outside the area of the fire's origin: "all of the lights should have been documented and eliminated accordingly." (ECF No. 171, Ex. K at 157-60). The halide light fixtures were thus relevant to Schaal's causation theory.

With regard to the electrical problem in the meter cabinet, Cunningham cites to the supplemental report of Icove:

> A majority of the experts listed in this report believed the origin of the fire was related to an unbalanced load on Phase A. Several of the initial experts involved in processing the fire scene collected only part of the physical evidence, leaving behind the two 225-ampere, 42-circuit panels. Photographic documentation of these two panels prior to their abandonment shows some of the circuit breakers in the tripped position . . . .
> The ability to assess the potential for tracing the unbalanced loads within the liquor store was significantly diminished by the failure by any of the private experts to document in their initial investigations and later expert reports each individual circuit breaker along with tracing each circuit to the load producing appliances, lighting, and other electrically supplied devices within the store. Collecting this data could have (1) bolstered or eliminated hypotheses as to whether an unbalanced load occurred and (2) assisted in determining if a downstream appliances malfunctioned or other electrical event caused this fire.
> Many of these omissions are contrary to the generally accepted guidelines and accepted standards of care for conducting fire investigations and properly arriving at scientifically-based conclusions. This lack of documentation and failure to collect and preserve essential evidence impacts the ability to correctly arrive a[t] opinions as to a fire's origin and cause. However, industry standards of

13

>professional care and responsibility place that burden on the forensic experts, particularly those who have early access to the critical evidence.

Cunningham Reply Mot., Ex. U at 6 (available in paper format only). Later in his report, Icove reiterates that:

>There is nowhere in the expert reports where any of the on-scene experts recorded the information on (1) which circuit breakers were tripped, (2) to which outlet, lighting fixture, or appliance did that circuit feed, or (3) whether these circuits were trace[d] and examine[d] for arc faults. Note that NFFPA 921 provided a form ... to collect and preserve information on the condition of the circuit breaker panels and the position the breakers are found. Recording this information could have allowed another expert to determine how the unbalanced load occurred, which is an essential fact never developed in this case.

*Id.* at 44. Thus, Pepco's expert deems the circuit breaker panels relevant.

### D. Resulting Prejudice.

"Spoliation of evidence causes prejudice when, as a result of the spoliation, the party claiming spoliation cannot present evidence essential to its underlying claim." *Victor Stanley*, 269 F.R.D. at 532. If the prejudice is extreme, dismissal may be appropriate. However, to order this harshest sanction, the court must "conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." *Id.* at 534 (citations and quotation marks omitted). Here, there is no evidence that the spoliators' actions were taken in bad faith and thus the actions alone are not so egregious as to warrant dismissal. *Silvestri*, 271 F.3d at 593 (Dismissal "is usually justified only in circumstances of bad faith or other 'like action.'"). In *Silvestri*, the level of culpability "was at least negligent and may have been deliberate" and thus it was "not clear whether Silvestri's conduct alone would justify dismissal." *Id.* at 594. As to the prejudice prong, "the Court must examine the record that remains to determine whether it contained enough data for the aggrieved party to build its case or

defense, and the Court must decide whether a lesser sanction than dismissal [or default judgment] would level the playing field." *Id.*; *see also Sampson*, 251 F.R.D. at 180 (stating that the second prong requires proof that "plaintiff was highly prejudiced and denied the only means to establish her case").

Cunningham can defend this case without the missing evidence. As noted, his expert Michael Wald opined that the most likely cause of the fire was an electrical failure in Pepco's metering equipment. Wald does not rely on the halide lights or the circuit breaker panels. Expert Schaal also points to an electrical fault within the meter base and cabinet. (ECF No. 171, Cunningham Summ. J. Mot., Ex. L at 10). Schaal identified multiple potential sources of this electrical fault, all of which exculpate Cunningham, and none of which requires the circuit breaker panels or the halide lights in order to be persuasive.

Schaal also states that the fire could have been prevented or minimized had Marlow Liquors not left combustible materials close to the meter cabinet. Schaal theorizes that hot metallic particles fell on the nearby combustible materials, and states that if Marlow Liquors had complied with the three foot clearance requirement for electrical distribution equipment, then "the fire would have been minimal in nature and most likely controlled and extinguished within the immediate area of the electrical distribution equipment." (ECF No. 171, Cunningham Summ. J. Mot., Ex. L at 10). This theory similarly does not involve the circuit breaker panels or halide lights. Schaal also faults Pepco for knowing about the overloaded condition and failing to notify Marlow Liquors to correct it:

> Pepco also failed to upgrade the incoming electrical service to mitigate a severe fire hazard. If Pepco did notify Marlow Liquors, Marlow Liquors should have taken appropriate action coordinating with Pepco to correct the overloaded hazardous condition. All other possible sources of ignition were considered and ruled out during the court of our investigation/analysis.

15

*Id* at 11.  At no point does Schaal contend that this defense is limited because of the missing evidence.

**III.     Conclusion.**

Cunningham is not without a defense and thus has not met his burden of showing extreme prejudice sufficient to warrant dismissal of all claims against him.  Nevertheless, he will likely be entitled, at the very least, to appropriate adverse inference instructions at trial.

Date: <u>November 6, 2012</u>                                               /S/
                                                                JILLYN K. SCHULZE
                                                                United States Magistrate Judge